Filed 1/9/15  In re C.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re: C.M., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEATH AND HUMAN SERVICES AGENCY, | D066081 |
| Plaintiff and Respondent, | (Super. Ct. No. J518518) |
| v. | |
| A.F. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Elizabeth A. Riggs, Judge.  Affirmed.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant, A.F.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant, C.M., Sr.

Thomas E. Montgomery, County Counsel, John E. Philips and Lisa Maldonado, Deputies County Counsel for the Plaintiff and Respondent.

A.F. (mother) and C.M., Sr. (father) appeal from an order terminating their parental rights to their child C.M. and choosing adoption as the appropriate permanent plan under Welfare and Institutions Code[1] section 366.26.  Asserting she maintained frequent and consistent visitation with C.M. and thereby preserved her parent-child bond, mother contends the juvenile court erred by declining to find C.M. would benefit from continuing his relationship with her under the beneficial-relationship exception to adoption preference.  (§ 366.26, subd. (c)(1)(B)(i).)  Father joins in her contentions.  We conclude the juvenile court did not err by finding the beneficial relationship exception did not apply.  Accordingly, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*Agency's Section 300 Petition and Amended Petition for C.M.*

In September 2012, the San Diego Health and Human Services Agency (Agency) filed a section 300 petition on behalf of then two-month-old C.M., alleging under section 300, subdivision (a) that father inflicted serious nonaccidental physical harm by swaddling him and tying a blanket around his eyes so tight as to cause bruising to his upper and lower eyelids, forehead, right cheek and tongue; a puncture wound to his left foot; and a subconjunctival hemorrhage.  Agency alleged that mother, who was then 16 years old, believed the child was not safe in father's care but did not protect him.  Agency

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

subsequently recommended C.M. be detained outside of his home, and the parents be offered reunification services with supervised visits. The juvenile court ordered C.M. detained with the Polinsky Child Center or an approved foster home, and gave the social worker discretion to detain the child with a relative or nonrelative extended family member. Mother and father visited C.M. consistently at Polinsky in September and early October, and staff observed that mother nursed and fed him, was focused on him, and was "very good" with him when he was crying and screaming. After C.M. was placed in foster care, his foster mother observed during a scheduled visit that mother was loving and attentive to C.M. and his needs.

In October 2012, Agency amended its petition to add allegations under section 300, subdivision (e) that C.M. suffered severe physical abuse from father, including fractures to his ribs and upper arms, multiple bruises and tears to his upper and lower frenula (the connection from upper and lower lips to gums) and under section 300, subdivision (i) that he suffered from father's acts of cruelty. C.M. was detained in a licensed foster home. In a report for an October 16, 2012 jurisdiction/disposition hearing, Agency stated that father admitted causing C.M.'s injuries due to his frustration and lack of patience, and mother was aware C.M. was being bound and blindfolded but denied knowledge of the extent of his injuries and was unable to stop father from abusing the child or leave to protect him. It reported that father was arrested on October 4, 2012, and charged with 10 counts of felony child cruelty, and it recommended that due to the severity of the physical abuse, mother and father not be offered reunification services but mother have supervised visits and father be subject to a no-contact order. On October 16,

3

2012, the juvenile court ordered C.M. detained in a licensed foster home, and Agency to provide mother voluntary reunification services.

*Mother's Reunification Efforts and Compliance with Case Plan*

In early November 2012, Agency recommended mother be offered reunification services with continued supervised visitation. C.M. was placed with a paternal great uncle and aunt. Mother had been attending weekly parenting classes with her own mother and had twice-a-week visits with C.M. since mid-October that were loving and positive, with mother attentive to C.M. and his needs: soothing, rocking and playing with him appropriately. She was referred to individual therapy. Father was incarcerated. Agency noted that mother was only 15 years old when she gave birth to C.M., and her judgment was affected by her life inexperience, immaturity and undeveloped thinking. It also observed mother had a long history of significant exposure to domestic violence between her own mother and father as recently as 2010 and 2011, and she exhibited many of the abnormal conditions associated with such trauma, which included posttraumatic stress, physiological problems and negative brain development in young children; and in teenagers, a tendency to enter into violent relationships, mental health issues and substance abuse problems.[2] Agency stated her judgment was impaired as a result. Agency expressed concern that mother did not have the knowledge and experience to connect C.M.'s nonaccidental bruising as an action of severe physical abuse, she may not

---

[2]    Throughout the reunification process, mother told Agency that she did not wish to reunify in her own mother's home; that it was an inappropriate place for C.M. to live. As of February 2014, neither mother's mother nor sister was approved to supervise visits.

4

be able to assess physical abuse behaviors in future relationships, and such relationships could place C.M. at risk for future harm. However, it observed mother had previously engaged in some protective actions, and because she had positive interactions with C.M., consistent visitation and was able to participate in services, it planned to offer her structured and intensive parent education and individual therapy, and recommended family reunification services.

Mother's case plan was updated in April 2013. Mother's therapist had reported to Agency that mother was "stuck" and making choices that did not keep herself safe and did not demonstrate her ability to keep C.M. safe. Mother was ambivalent about her ongoing relationship with father, and told her therapist she knew if he was released she would go back to him right away. The therapist recommended discontinuing individual therapy and that mother attend a 52-week child physical abuse psychotherapy group. Agency recommended that mother undergo a psychiatric medication evaluation as she had reported having visual hallucinations for several months. Mother was presently on Zoloft, which was prescribed by a physician. She was referred to a psychiatrist but missed the appointment.

In a May 2013 six-month review hearing status report, Agency recommended mother's reunification services be terminated and that C.M. remain in out-of-home care with his paternal aunt. It reported that then 9-month-old C.M. was healthy, happy, well-adjusted, and very comfortable in the care of his paternal aunt and her family. He was also very comfortable with mother, responding positively when he saw her by smiling and moving animatedly. However, though mother had completed a parent education

class, participated in individual therapy and engaged in supervised visits with C.M. with safe, positive and loving interactions, she had not made the necessary substantial progress in therapy to address the protective risks to C.M. Specifically, mother was in contact with father and his sister, sharing pictures and updates about C.M., and though she knew father was subject to a criminal protective order barring contact with her, she was planning a birthday party with father's mother around the time of father's release from jail, and exhibited a "cavalier, carefree demeanor" about her plans, expressing confidence in father's remorse. Mother became angry when the therapist sought to address the issue, and told her she would not return. Mother had intimated to an Agency worker and her therapist that she planned to have a relationship with father, made assumptions he was safe around C.M., and she put her own unmet emotional needs ahead of her and C.M.'s safety. Mother then denied having those feelings about father after his release from prison. Mother also reported to her therapist that she had been forcibly raped in her own home by a 18- or 19-year-old man she met on the trolley to whom she gave her contact information, but was unwilling to pursue charges. Mother declined to return to individual therapy and had stopped her medication for a period of time, which resulted in her exhibiting erratic behavior.

Agency reported that when asked to process the connection between C.M.'s trauma and her recent assault, mother "shut down," and was unwilling to address how her behavior impacts her or C.M. She had a pattern of rejecting people who challenged her to improve her decisionmaking, and did not follow through with her therapist's recommendation for a medication evaluation and monitoring by a psychiatrist. Based in

6

part on mother's dangerous judgment, Agency concluded mother had not demonstrated any ability to protect herself from harm, and, in turn, could not protect C.M. She had not increased her protective capacities with regard to assessing physically abusive behaviors in her future relationships that could potentially place C.M. at risk for future harm, she lacked motivation to address those issues, and she had not made the necessary behavioral changes and thinking conducive to increased safety for C.M. over time. Agency recommended a section 366.26 hearing be set to determine a permanent plan for C.M. Mother began seeing a new therapist in April 2013.

In August 2013, Agency reported in an addendum report that mother's new therapist told Agency that mother's progress in meeting her parenting, protection, safety and independence goals was still very slow; mother having met only two of seven goals. Mother's visits with C.M. remained supervised as she had not been able to demonstrate over time that she would be able to protect him from unsafe associations or actions from others. Agency acknowledged mother's slow progress in addressing the risk factors affecting C.M.'s safety, but pointed out she positively engaged in individual therapy and she consistently attended her child abuse treatment class, as well as her medication management appointments. Mother reported being compliant with her psychotropic medication. Given that progress, Agency recommended that mother continue to receive services until the 12-month review date. The court vacated the 6-month review hearing and set the matter for a 12-month review hearing; ordered that mother continue reunification services; and ordered Agency to assist her in becoming independent, assess

7

an appropriate living situation, and explore emancipation. In September 2013, the court appointed a special advocate (CASA) for C.M.

As of early October, mother's new individual therapist reported to Agency that mother, who was then 17 years old, was "not capable of taking care of herself leave alone a toddler." Mother had stopped going to school and gave her therapist differing stories about her future plans for school or independence. Mother also admitted throwing temper tantrums and destroying things when she did not get her way; the therapist observed that some of her behaviors were normal but some mimicked the domestic violence relationship she witnessed with her own parents, and she felt mother had a lot of unresolved issues with the trauma she was subjected to, combined with typical teenage behavior.

In November 2013, C.M.'s CASA reported that 1-year-old C.M. was thriving and flourishing in his placement with the relative caregiver, who had a good relationship with mother and coached her in caregiving skills. Mother had missed two therapy sessions with her therapist, who would terminate her if she missed one more session. Mother was not contributing information during her child abuse prevention class, only drawing or doodling throughout. She was still living in her mother's home, which Agency determined was not safe for C.M. Mother's visits with C.M. were positive, and she engaged in the full range of caregiving activities, and played with C.M. in a warm and engaging manner, but the CASA recommended her visits remain supervised until mother had a transportation plan and took greater initiative in independent living. The CASA described mother's progress as slow, and the fact she was a nondependent,

8

nonemancipated youth had prevented her from receiving the community-based services referred to in her case plan. The CASA recommended that mother receive reunification services to the 18-month review hearing, with increased visits as deemed appropriate.

Agency, however, in status review and addendum reports for the 12-month review hearing, recommended that mother's reunification services be terminated and a section 366.26 hearing be set, with continued supervised visits. It observed that while mother's one-on-one interactions with C.M. were very positive, engaging and safe, she had not been able to demonstrate that her past trauma would no longer negatively impact her decisionmaking, that she had developed new thinking, that she could take action to protect herself and C.M. from physical harm, or that she had a plan for C.M.'s future safety and well-being. Mother was not fully participating in services, she displayed very dangerous judgment in inviting the man who assaulted her into her home, and she was planning to move in with a man who she identified as a family friend but did not know a lot about, which was naïve and risky behavior. Mother lacked the ability to follow through on appointments (having several unapproved absences from her child abuse group sessions, and missing seven therapy sessions), and made excuses and placed blame on others. She had not seen her psychiatrist since July 2013, though the doctor required minors to see her monthly. She demonstrated no ability to care for herself much less a vulnerable young child.

In February 2014, Agency reported that in January 2014, police found mother and father together reclining in a car watching a movie, and father was arrested for violating a protective order requiring him to stay away from mother. When confronted with the

9

situation, mother "shrugged her shoulders."  She had no explanation other than father wanted to talk to her and she did not feel anything was wrong with that, and she denied knowing about a restraining order.  Agency observed that in December, Mother had cancelled an individual therapy appointment and was not attending all of her child abuse group sessions.  Mother lacked progress in her plan for independent living.  Mother started seeing a new therapist.  Agency did not change its prior recommendation to terminate reunification services.  In an addendum report, Agency observed that mother had been participating in services for approximately 16 months but had not demonstrated she was mature enough or capable of achieving independence or caring for herself, did not consistently attend school, and was on her third therapist as a result of continued absences.  Mother continued to place blame on others for her absences or missed visits and appointments.  It concluded that mother had been given a significant amount of time to make substantial progress but did not, and that C.M. deserved permanency.  Agency again recommended that the court terminate reunification services and set a section 366.26 hearing.

That same month, C.M.'s CASA likewise recommended that mother's reunification services be terminated and a section 366.26 hearing be set.  In addition to mother's January 2014 meeting with father, the CASA noted that mother had missed over three weeks of school in late December 2013 and early January 2014 then stopped going altogether, and she had been unable to find employment.  C.M. continued to thrive in the caregiver's home, and mother visited with him twice a week, playing with him in an engaging and appropriate way.  C.M. had a "healthy attachment with his caregiver and

with [mother]," and the CASA recommended that he remain placed there with supervised visits between him and mother. The CASA expressed "greatest concern" in mother's "ability to stand firm in her resolve to not meet with [father]," observing that while mother realized it was a mistake and did not want father to have contact with C.M., she nevertheless voluntarily met with him in disregard of the restraining order.

*Contested 12-Month Review Hearing*

At the February 11, 2014 12-month review hearing, the juvenile court ordered C.M.'s continued placement in the caregiver's home. It found mother had not made substantive progress with her case plan, and it terminated mother's reunification services, ordered Agency to prepare an assessment, and set a section 366.26 hearing for June 2014.

Social worker Ernesto Escobar prepared Agency's June 2014 section 366.26 assessment report. He recommended that the court terminate parental rights and establish a permanent plan of adoption. He reported visiting C.M. on a monthly basis and observed C.M. was happy and well attached to his caregiver, and sought her out for comfort and soothing. Escobar recounted the history of mother's contacts with C.M., and his observations after supervising two one-hour visits between mother and C.M. on April 22, 2014, and May 8, 2014. At the first visit, C.M. greeted mother cordially, and they played together throughout the visit; mother was attentive and C.M. laughed out loud while they jumped in a trampoline and smiled during their play. While mother and C.M. watched cartoons, the caregiver informed Escobar that mother visited consistently once or twice a week, staying three or four hours at a time, and sometimes accompanied the caregiver and C.M. to run errands. When mother left, C.M. waved goodbye and was

11

picked up by the caregiver. C.M. showed no distress or anxiety at being separated from mother.

At the second visit, mother arrived on time and sat on the floor to play with C.M. They played, watched cartoons, and she read children's books to him. When Escobar and mother left, C.M. waved goodbye from the caregiver's arms, and likewise did not show anxiety or distress from his separation from mother.

Escobar assessed C.M. as highly adoptable given his age and good health, and his caregiver relatives were very interested in adopting him. He reported a high likelihood they would be approved for his adoption, but that there were 126 families with approved home studies willing to adopt a child like him. Though mother engaged in consistent supervised visits with C.M., engaging actively with him by reading, playing and singing, and C.M. apparently enjoyed playing with her, it was Escobar's opinion that their relationship was more consistent with a playmate relationship than a parent-child relationship. C.M. still related to his caregiver as his primary maternal figure, without asking for his mother or crying when she left. He stated if parental rights were terminated, C.M. would suffer "very minimal detriment from the permanent separation . . . .", which he observed might only be a technicality considering the good relationship between the caregiver and mother, and the caregivers' willingness to allow her to be involved in C.M.'s life. Escobar described C.M. as being in a good position, in a safe placement with caregivers who had been giving him love and nurturing him since his November 2012 placement with them. According to Escobar, permanency was preserved in C.M.'s current placement and adoption would ensure it; the possible

12

detriment caused by the termination of parental rights was outweighed by the need for permanency in C.M.'s life. Thus, Escobar stated it was in C.M.'s best interest that the court terminate parental rights and establish a permanent plan of adoption for C.M.

C.M.'s CASA also recommended that parental rights be terminated and adoption be selected as the permanent plan. She found C.M. to be socially engaged, with a big smile and a love for play. She observed he called his caregivers "mama" and "dada" and appeared to have a strong emotional connection with them. He liked his caregiver's attention and would speak to her or bring her a toy to engage, and willingly went to her husband to be picked up and fed. C.M. routinely interacted with the older boys and they treated him like a brother. The CASA stated the caregivers had provided a safe, nurturing home for C.M., were willing to adopt C.M., planned on completing adoption classes, and were willing to do whatever necessary to facilitate the adoption process. She observed mother and C.M.'s interactions to be warm and engaging with positive physical interactions, but mother admitted to the CASA that adoption was best for C.M., though it was hard for her to accept. Because C.M. was thriving physically, emotionally, and developmentally in his placement, the CASA felt a placement change would cause significant trauma, and she recommended he remain placed with his caregivers, who had strong family connections and offered C.M. nuclear and extended family relationships. The CASA pointed out that father was never offered reunification services, he was currently incarcerated, and protective orders precluded him from having visitation with C.M. Though the CASA acknowledged C.M. had a good relationship with mother, the CASA pointed out her reunification services were terminated in February 2014, that C.M.

13

deserved a permanent family who could provide a loving and a stable home, and that adoption was in his best interest.

*Section 366.26 Hearing*

At the section 366.26 hearing, the trial court read and considered social worker Escobar's section 366.26 assessment report, the CASA's report, and father's stipulated testimony that he loved C.M., wanted to do whatever it took to change and be the father C.M. needed, and did not want his son adopted. Mother's counsel argued the parent-child bond exception should apply based on the quality and quantity of mother's visits with C.M. Agency's counsel argued that even assuming a significant relationship existed between mother and C.M., the detriment of severing the relationship had to be weighed against the plan of adoption because of the benefit C.M. would receive from adoption. The court found by clear and convincing evidence there would be no detriment to severing the parent-child relationship, that C.M. was likely to be adopted, that adoption was in C.M.'s best interest, and it was the appropriate plan for him. Adopting the June 2014 recommendations by Agency and the CASA, it terminated all parental rights of mother and father.

Mother and father filed these appeals from the order terminating their parental rights.

## DISCUSSION

### I. *Legal Principles and Standard of Review*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. (*In re S.B.*

14

(2008) 164 Cal.App.4th 289, 296; *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  "If the dependent child is adoptable, there is strong preference for adoption over alternative permanency plans."  (*In re S.B.*, at p. 297; *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.)  Under section 366.26, if parents have failed to reunify with a child, and the juvenile court determines by clear and convincing evidence that it is likely the child will be adopted, the court "shall terminate parental rights and order the child be placed for adoption."  (§ 366.26, subd. (c)(1).)

In order to avoid termination of parental rights and adoption, a parent must show that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)  The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53; see also *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 ["Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."].)  The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances:  [¶]  . . .  The parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  This court construes the "benefit" necessary to trigger this exception to mean that "the

15

relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

The parent asserting the exception has the burden of proving it by a preponderance of the evidence.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)  The parent will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits.  (*Ibid*.; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)  There must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child.  (*In re C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a *parental* relationship is necessary[.]' "].)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the

16

determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ." (*In re J.C.*, at p. 531.)

II. *Mother Did Not Meet Her Burden to Establish the Beneficial Relationship Exception*

We conclude the juvenile court did not abuse its discretion by concluding termination of the parent-child relationship would not be detrimental to C.M., and that the benefit of C.M.'s adoption by his caregivers outweighed the potential harm caused by the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).)

There is no dispute that the record shows mother had consistent twice weekly visits with C.M., and that her visits were appropriate and positive. Mother was loving and attentive to C.M.'s needs and cooked, fed, changed, bathed and played with him; soothing and comforting him appropriately. She participated in child massage sessions and C.M.'s swimming lessons at the caregiver's invitation. However, as stated, regular, loving visits, without a more significant positive attachment between parent and child, are not enough. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re Beatrice M.*, *supra*, 29 Cal.App.4th at pp. 1418-1419; see also *In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1199; *In re I.R.* (2014) 226 Cal.App.4th 201, 213; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642-643.)

17

Substantial evidence supports the juvenile court's conclusion that despite her emotional bond to C.M., mother did not establish that their relationship " 'promotes [his] well-being . . . to such a degree as to outweigh the well-being [C.M.] would gain in a permanent home with new, adoptive parents.' " (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The record does not establish mother's bond with C.M. constituted a substantial positive emotional attachment, or the requisite parental bond, such that severing the natural parent-child relationship would greatly harm C.M. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother cites no evidence that the termination of her relationship with C.M. would be detrimental to C.M. or that their relationship conferred benefits to C.M. more significant than the permanency and stability offered by adoption. C.M. easily separated from mother at the conclusion of visits, and there is no bonding study or other evidence to counter Agency's conclusion that C.M. would experience "very minimal detriment" from permanent separation and termination of parental rights, and that any possible detriment was outweighed by C.M.'s need for permanency. (Accord, *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 533-534; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)

Here, C.M., who had been removed from mother and father's care when he was only two months old, was thriving in his placement, looked to his caregivers for primary comfort and care, referred to them as "mama" and "dada," and was observed to have a strong emotional connection with them. Even if we were to assume there was evidence that mother and C.M. had a parent-child relationship, mother did not establish further that C.M. would be greatly harmed (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) by

18

terminating her parental rights. Mother ignores the evidence that despite reunification services provided to her, she could not fulfill her parenting and other individual goals including schooling, compliance with psychotropic medication and other care, and becoming independent from her living situation with her own mother, which was inappropriate for C.M. Mother made a decision to invite a man into her home who assaulted her, and she contacted father after his release from jail, which showed poor choices and judgment as well as an inability to stay away from unsafe associations and situations. Importantly, as a result, mother's visits with C.M. never progressed beyond the need for supervision. (Accord, *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

Ultimately, Agency and C.M.'s CASA concluded that C.M. was doing well in the home of his caregivers, who were committed to adopting him and who were meeting all of his emotional, medical and developmental needs. Agency's social workers believed C.M. needed a safe, stable and permanent home with parents who could meet his needs, and he should not have to wait for permanency. The juvenile court was entitled to credit the assessments and conclusions of the social workers and the CASA. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.) In view of this and the evidence recited above, we uphold the juvenile court's conclusion that no beneficial relationship existed such that termination of mother's parental rights would be detrimental to C.M.

Father's sole position is that if we reverse the order terminating parental rights as to mother, we must likewise reverse the order as to him and remand the matter to conduct

19

a new section 366.26 hearing to select a different permanent plan.  As we have upheld the order as to mother, father has shown no basis to reverse the order as to his parental rights.

DISPOSITION

The order is affirmed.


O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

AARON, J.

20